IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DARNELL A. DAVIS
      PETITIONER,

  (V)

RICHARD KEARNY,
WARDEN,STATE OF
DELAWARE.

ID NO. 0307017279A
CRA. NO.03-08-0287
THRU 0293

(CIVIL ACTION NO.06-709)
     G M S

---

DEFENDENTS MEMORANDUM OF LAW IN SUPPORT OF PETITION UNDER 28 U.S.C. 2254 for a writ of
(HABEAS CORPUS)

---



FILED

MAR - 2 2007

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

TABLE OF CONTENTS

                                                              Pages

Statement of Charges     . . . . . . . . . . . . . . . . .     1

Nature of Defense at Trial   . . . . . . . . . . . . . .     2

Summary of the Evidence . . . . . . . . . . . . . . . .     3

Significant Applications and Rulings . . . . . . . .     17

Exhibits:

i

## STATEMENT OF CHARGES

On August 19, 2003, Darnell A. Davis, hereinafter the Defendant-Below, Appellant, was arrested on charges of Rape in the First Degree, Possession of a deadly weapon during the commission of a felony (Rape 1st degree), Aggravated menacing, Unlawful sexual contact in the first degree, possession of a deadly weapon by a person prohibited, unlawful imprisonment in the first degree and endangering the welfare of a child. The offenses were alleged to have occurred on or about July 13, 2003 involving Yalisha Joynes who was, on that date, 17 years old.

On or about October 2, 2003, the State filed an Information charging the Defendant below, Appellant with the above stated charges. Prior to trial, upon Motion by the Defendant below, Appellant, the charge of possession of a deadly weapon by a person prohibited was severed from the Information. Prior to trial, the State dismissed the Endangering the welfare of a child charge.

Appendix pages A-5 thru A-7 is a copy of the Amended Information upon which the Defendant below, Appellant was tried by a Jury in the Superior Court of the State of Delaware in and for Sussex County.

1

## NATURE OF DEFENSE AT TRIAL

Trial was held on July 12 thru 15, 2005, before a Sussex County jury with The Honorable E. Scott Bradley, Judge of the Superior Court of the State of Delaware in and for Sussex County presiding.

The Defense presented, by the cross examination of the State's witness's, specifically the victim, Yalisha D. Joynes, their lack of memory, the unreasonableness of their testimony, the inconsistency of their testimony with respect to the other witnesses testimony and to their prior statements given to the Delaware State Police, which statements were admitted pursuant to 11 Delaware Code Section 3507, their motives, bias, and prejudice actuating their testimony, their interest in the outcome of the trial, the apparent untruthfulness of their testimony and their manner and demeanor upon the witness stand.

The Defendant below, Appellant presented three witnesses to contradict the testimony of the victim. The Defendant below, appellant, testified the victim performed oral sex on him but at a different location and different time then the statement of the victim. The Defendant below, appellant, testified that the oral sex was performed by the victim with her consent and without any threat or force being exerted upon the victim.

2

## SUMMARY OF THE EVIDENCE

The State presented the testimony of the victim, Yalisha Joynes, whose date of birth is August 28, 1985. Therefore, at the time of the alleged events, the victim was 17 years old. (A-8,9)

On the date in question, Ms. Joynes was visiting her cousin who lived at the Hollybrook Apartments in Laurel, Delaware. Ms. Joynes stated she did not like to stay overnight anywhere and she could not remember ever staying overnight with her cousin. (A-10 thru A-12)    At about 10:00 pm, Ms. Joynes walked to Charlotta Hughes (her friends) home in the apartment complex in an attempt to get a ride home. (A-12a) Her friends brother was unable to give her a ride home. (A-13)    A white car pulled up with a female driver (Nakeama Davis) and a male passenger (Defendant below, Appellant). The female driver asked Ms. Joynes if she was looking for a ride home. After speaking with the female driver, Ms. Joynes accepted a ride from her. (A-14,15)

Upon leaving the Hollybrook Apartment complex the car pulled into the Carvel Garden Apartment complex located across the road from the Hollybrook Apartment complex. (A-16)    The male passenger exited the vehicle returning a short time later at which time they left the Apartment complex. (A16,17)

The female driver drove to a residence in Concord, Delaware,

for the purpose of checking on her children. They arrived at approximately 12:00 midnight. (A-18) Upon entering the residence Ms. Joynes saw three other males in the house. They engaged in conversation. Ms. Joynes testified she felt she would not be taken home in the next few minutes. The male needed to use the phone so he and Ms. Joynes and another male got back into the car and drove to the Concord store to use the phone. (A19,20)

Upon arriving back at the house, the female driver and the other male at the residence got into an argument that he was not going to watch the females children any more and she had to stay there. (A-21,22)

The male (Defendant below, appellant) told Ms. Joynes that he had a friend who lived close by that would take her home. They then left the residence and started walking down the road. (A-23)

Upon arrival at the house, the male (Defendant below, appellant) knocked on the door. A male answered the door and engaged in conversation with the Defendant below, appellant. Ms. Joynes testified it became apparent that the person who answered the door was not going to give her a ride home. They entered the home and the Defendant below, appellant, went inside a room, took off his shirt and pants and laid down on the bed. Ms. Joynes testified she sat on the edge of the bed. (A-24,25)

4

Ms. Joynes testified that when the sun came up, she could hear people moving in the house. She testified she was on the couch trying to get some sleep when the Defendant below, appellant, was trying to wake her up. (A-26,27)

After getting up, Ms. Joynes testified she went outside to wait for the Defendant below, Appellant, to come out and get a ride home. They "were taking entirely too long" to come out and take her home so Ms. Joynes decided to walk to Concord to a house where people she knew lived. (A-28)

Ms. Joynes testified the Defendant below, Appellant, came out and asked her if she wanted to see into a building on the property which used to be a barbershop but was now a record store. When she went into the building, the Defendant below, appellant, closed the door and shoved Ms. Joynes inside. There were no lights in the building. The Defendant below, Appellant, led her to a futon and made her take off her clothes while he had a stick in his hand. (A-29,30)

Holding the stick in a cocked manner, the Defendant below, appellant made Ms. Joynes take off her clothes. He unzipped his pants, "pulled his stuff out and put his stuff in my mouth". While doing this he put his hand on her shoulder and made her give him oral sex. (A-31,32)

After the Defendant below, Appellant, was finished, he

permitted Ms. Joynes to put her clothes back on. At this time
she noticed her bracelet was broken. Ms. Joynes testified she
threw the broken bracelet underneath the futon when the
Defendant below, appellant, has his back turned. (A-33,34)

Ms. Joynes testified she then left the building and walked
to a friends house in Dove Estates in Concord, Delaware. (A-32)
Upon arriving at the house she spoke to Shanice Showell. Upon
entering the house Ms. Joynes called her cousin, Tremaine, her
brother, Ty, and then she called the Delaware State Police. She
said she did not call her mother. (A-35,36)

A uniformed Delaware State Police officer arrived  (Officer
Scott Workman) whom she talked to freely and voluntarily.
Thereafter Det. Messick arrived.   After telling him what
happened, Det. Messick drove down the road where Ms. Joynes
pointed out the residences she had been in and then he took her
to the hospital. (A-37 thru A-40)

On cross examination, Ms. Joynes admitted that she lived  in
Wexford Village. This is an apartment complex located on the
west side of Laurel. Further Hollybrook apartments is located on
the east side of Laurel. Ms. Joynes estimated it was three of
four miles between Hollybrook Apartments and Wexford Village.
(A-41 thru A-44)

Ms. Joynes admitted that after going to Carvel Gardens

6

apartments the female drive stopped at a stop sign. To get to her house the car should have gone straight thru the intersection, thru the Town of Laurel to Wexford Village. Instead the car turned to the right, left the town of Laurel heading toward Concord. That the car went in the opposite direction from her residence. That going to Concord was 15 to 20 minutes out of the way. (A-45 thru A-49)

After the argument between the female driver and the male who was babysitting her children, Ms. Joynes admitted she knew that the female driver was not going to take her home and she did not remember if the female driver had a phone. (A-50,51)

Ms. Joynes admitted going to the Concord Store from the female drivers house and going back to her house. She was not sure if she used anyone's phone to call home. (A-52)

Ms. Joynes admitted going with the Defendant below, Appellant, to his friends house on foot. She also admitted that her friends house in Dove Estates in Concord was closer then the friends house of the Defendant below, Appellant. (A-53)

Ms. Joynes admitted putting her telephone number on the Defendant below, Appellants cell phone. (A-53a)

Ms. Joynes admitted that while she and the Defendant below, Appellant were on the bed in the friends home or while she was on the couch no inappropriate conduct took place. There was no

7

physical contact between the two nor were there any statements or conversations about sex between the two of them. (A-54,55)

Ms. Joynes admitted she threw the broken bracelet under the futon because she "was going to leave something so that when they came back to this place, to check it out and everything, they know I had been there". (A-56)

Ms. Joynes denied the Defendant below, Appellant, put his hands around her neck. She admitted she might have told the police the Defendant below, appellant did this. (A-57)

With respect to the SANE examination, Ms. Joynes could not remember her conversation with Nurse Holbrook, but what ever the nurse says she said must be the truth. (A-58) She admitted that she had no injuries to her body when she went in the hospital. (A-59)

Ms. Joynes admitted she called several people before she called the police to report this alleged event. It was her brother that "brought her back to reality" to get her to call the police. (A-60)

The State presented the testimony of Shanice Showell. Ms. Showell testified Ms. Joynes made two phone calles, one to her mother and one to the State Police. (A-61)

The State presented the testimony of Norissa Sears, the mother of Ms. Joynes. Ms. Sears testified that she has an

8

arrangement with Ms. Joynes, if Ms. Joynes needs a ride, she is to call her, if she is going to spend the night somewhere, she is to call and let her know.  But she is to call early, because she might go to bed. Because when she goes to bed early she turns the phone off. (A-62 thru A-64)

Ms. Sears admitted Ms. Joynes called her from Shanice Showells house on the morning of the incident. (A-65) She further testified that Ms. Joynes would stay at her cousin's house maybe twice a month over the last year. (A-66,67)

The State presented the testimony of Officer Scott Workman of the Delaware State Police. On cross examination Officer Workman testified Ms. Joynes stated to him that the Defendant below, Appellant, forced Ms. Joynes to perform oral sex of the Defendant below, appellant. That during this the Defendant below, Appellant, "pushed the victim's head and grabbed (her) throat". Officer Workman observed no physical injuries on Ms. Joynes. (A-68)

The State presented the testimony of Debra Holbrook, a registered nurse employed by Nanticoke Memorial Hospital in Seaford, Delaware. Ms. Holbrook is a certified sexual assault nurse examiner, a SANE nurse. (A-69)

In obtaining a history, Ms. Joynes stated to Ms. Holbrook the Defendant below, Appellant, had a big stick in his hand. That

9

after the oral sex, she spit multiple places outside of the shed. (A-70)

During her examination she found no markings on her neck or throat. (A-71) She testified to finding a dried secretion on Ms. Joynes left breast. This was swabbed and retained. (A-72,73) Oral swabs of Ms. Joynes mouth and teeth were obtained. (A-74) Ms. Joynes refused the have a sample of her blood drawn. (A-75,76)

On cross examination Ms. Holbrook stated no vaginal examination was performed. The decision not to do a vaginal examination was Ms. Holbrook's. (A-77)

Ms. Holbrook also testified that in response to the question, "Beaten and choked" Ms. Joynes responded, No. (A-78) Ms. Holbrook testified she saw no evidence of being beaten or choked. (A-79)

On cross examination, Det. Messick testified that about 4 days after the incident he searched the building where the alleged sexual assault took place to see if he could find the stick and or bracelet. (A-80) Under the futon he found the bracelet. (A-81) He did not locate the stick. (A-82)

Det. Messick admitted Ms. Joynes told him, on the morning of the incident, that the Defendant below, Appellant, had grabbed Ms. Joynes by the throat. (A-83)

10

Det. Messick admitted he could find no evidence to establish that any kind of sex took place in the building where Ms. Joynes said it happened. (A-84)

The State recalled Yalisha Joynes for cross examination purposes. Ms. Joynes admitted she was expected home by 12:30 on the night of the incident.

She admitted that when the car drove over to Carvel Gardens that the Defendant below, Appellant, was talking to her cousin's brother. (A-85)  Ms. Joynes admitted telling Det. Messick that she knew a lot of people affiliated with the Defendant below, Appellant. In that way she could have helped Det. Messick locate the Defendant below, Appellant. (A-86) She further admitted that prior to the evening in question, she knew of the Defendant below, appellant as being a drug dealer. (A-87) She admitted that she knew and had visited Shanice Showell prior to the morning of the alleged incident. (A-88)

The State called Det. Messick who testified that Wexford Village was 1.8 miles from Hollybrook Apartments. Further, he testified is was 8 miles from Hollybrook Apartments to the female driver (Nakeama Davis) residence in Concord, Delaware. (A-89,90)

The State presented the testimony of Teri Zerbe from the State medical examiners office who testified the oral swabs done

12

on Ms. Joynes and the dental floss obtained from Ms. Joynes and the breast swab obtained from Ms. Joynes consisted of sperm cells. (A-91 thru A-93)  That the DNA found on these materials was a genetic match to the Defendant below, Appellant. (A-94)

The Defense presented the testimony of John E. Clayton, the cousin of Nakeama Davis and the man who was babysitting her children. (A-95) Mr. Clayton testified Ms. Davis, the Defendant below, Appellant, and Ms. Joynes were smoking weed and drinking alcohol on the night they came to Ms. Davis's house. (A-96) That on that night, Ms. Joynes and the Defendant below, Appellant, spent some time in the bedroom together. (A-97) Mr. Clayton testified the Defendant below, Appellant and Ms. Joynes left the residence and starting walking down the road. (A-98)

On redirect examination, Mr. Clayton testified they had no working phone at the residence and that at about 11:00 pm, the Defendant below, appellant and Ms. Joynes went to the De-Lux Dairy in Concord to use the telephone. (A-99)

The Defense presented the testimony of Anthony Reid who testified seeing the Defendant below, Appellant and Ms. Joynes at Nakeama Davis's residence as they were outside leaning against a car "kissing and stuff". (A-100)  He also testified that Ms. Joynes was drunk and smoking marijuana. (A-101)

The Defense presented the testimony of Davon Davis, the

Defendant below, Appellant's cousin. Mr. Davis testified that on the night in question, the Defendant below, Appellant, came to his house, on foot, and asked to spend the night. That Ms. Joynes was with the Defendant below, appellant. (A-102) There was no working electricity in the house on this occasion. (A-103)

Darnell A. Davis, the Defendant below, Appellant, took the stand in his own defense. On the evening in question, the Defendant below, Appellant and Nakeama Davis drove to Hollybrook Apartments to locate "CR" to purchase marijuana. While speaking to Rock, Charlotta Hughs brother, in an attempt to locate "CR", Ms. Joynes stated "CR" was at Carvel Gardens. (A-104) The Defendant below, Appellant, Nakeama Davis and Ms. Joynes got into the car and drove to Carvel Gardens. While enroute Ms. Joynes asked Nakeama for a ride home. (A-105,106)

While driving around, the Defendant below, Appellant testified that all three of them, including Ms. Joynes drank beer and smoked marijuana. (A-107)

When they arrived at Nakeama Davis's house in Concord the Defendant below, Appellant and Ms. Joynes got into a car that was parked next to the house. This is where Ms. Joynes performed oral sex on the Defendant below, Appellant. (A-108) While this was being done, Nikeama Davis came out of the house and saw the

two of them in the car. After they were done, the Defendant below, Appellant and Ms. Joynes exited the car and sat on the steps with Ms. Davis. (A-109)

The Defendant below, Appellant's brother needed to use the telephone, since there was not one in the residence, the Defendant below, Appellant, his brother and Ms. Joynes got into a car and drove to the De-Lux Dairy in Concord. (A-110)

When no ride was forthcoming, the Defendant below, appellant decided to walk to Davon Davis house. Ms. Joynes did not want to stay at Nikeama Davis's house so she walked with the Defendant below, Appellant. (A-111)

Upon reaching Davon Davis's house the Defendant below, Appellant was informed that no ride would be forthcoming so he decided to spend the night. (A-112) Ms. Joynes stayed with him.

The next morning the Defendant below, Appellant and Mr. Davon Davis got into a argument because Davon Davis would not give him a ride home. (A-113)

The Defendant below, Appellant said to Ms. Joynes that his girlfriend was going to be mad with him for not coming home. She became upset to learn the Defendant below, Appellant was still seeing his girlfriend. She got mad at the Defendant below, Appellant and left the house walking on the road. That was the last the Defendant below, Appellant saw Ms, Joynes. He denied

15

going into the building on Davon Davis property and denied having sex with her in that building. (A-114)



## SIGNIFICANT APPLICATIONS AND RULINGS

On the beginning of the third day of the trial, while the State was still presenting its case, the State argued the necessity of lesser included offenses in the closing instructions. As to the Rape in the First Degree, the State argued the necessity of a charge of Rape 2nd and Rape 4th as lesser included offenses. Further the State argued lessers for the Unlawful Sexual Contact 2nd to be Unlawful Sexual Contact 3rd. The Court deferred any ruling until the close of the case. (A115 thru A-125)

At the conclusion of the evidence, a prayer conference was held. The State requested certain lesser included offenses be included within the charge.

Rape in the First Degree, as charged herein, is intentionally engaging in sexual intercourse without the consent of the victim and during which the Defendant displayed a deadly weapon. The State argued if the jury found the Defendant below, Appellant was not armed with a deadly weapon then they Jury should have the fight to consider Rape in the Second Degree. Rape in the Second Degree is intentionally engaging is sexual intercourse without the victim's consent. The State argued if the Jury found that the sexual intercourse occurred with Ms. Joynes' consent but without a deadly weapon, the Jury should be

17

permitted to consider Rape in the Fourth Degree. Rape in the Fourth degree is intentionally engaging in Sexual intercourse with Ms. Joynes where the Defendant below, Appellant is over 30 and Ms. Joynes has not reached her 18th birthday.

The State argued, with respect to the count of Unlawful sexual contact in the first degree, the Jury should be permitted to consider Unlawful sexual contact in the third degree. Unlawful sexual contact in the first degree is the intentional sexual contact of the victim by the Defendant where the contact occurred without the victim's consent and the Defendant displayed what appears to be a deadly weapon. If the Jury were to find the Defendant did not have a deadly weapon they should be able to consider Unlawful sexual contact in the third degree. Unlawful sexual contact in the third degree is the intention sexual contact of the victim without her consent.

Judge E. Scott Bradley found that there was a rational basis in the evidence to acquit the Defendant on the charged offenses and to support conviction for the lesser included offenses. Therefore the Court permitted the inclusion of the lesser included offenses as outlined above.

The Jury convicted the Defendant below, Appellant, on the lesser included offense of Rape in the Second Degree and on the lesser included offense of Unlawful Sexual Contact in the Third

18

Degree.  The Defendant below, Appellant, was found not guilty on the balance of the charges.

# Table of Contents

Pages, i

I. Procedural Background. _____ 1-3.

II. Factual Summary. _____ 4-9.

III. Claim's Attacking Davis Conviction And Sentence;

Argument A.

Whether or Not Defendant Darnell Davis
is Entitled to A New Trial or Sentence
Based Upon his Trial Counsel's Ineffectiveness
In Violation of the Sixth Amendment
to the United States Constitution _____ 10-19,

Argument B.

the Need to establish the Prejudice
Prong of Strickland v. Washington _____ 19-20

DAVIS. Trial Counsel. Mr. CALLAWY. Filed A brief And A motion to withdraw pursuant to Rule 26(C). <u>Citing</u> his Failure to "preserve DAVIS Rights, And Ability to File A MEANINGFUL Direct Appeal to the DelAWARE Supreme Court."

5.  FEARING the CONSEQUENCES OF Scoring A "HAT Trick". A Timely Appeal WAS Filed IN the DelAWARE Supreme Court ON July 2005.

Following briefing. The DelAWARE Supreme Court ON Sept. 2005 AFFIRMED DAVIS Conviction

HENCE. THIS IS DARNELL DAVIS MOTION For Relief, PURSUANT to 28 U.S.C 2254 For A Writ of HabeAS Corpus)

9

# III. Claims Attacking Davis 2002 Conviction And Sentence:

## Argument.

A.    Whether or Not the defendant Darnell Davis is entitled to a New Trial And or Sentence Based Upon his Trial Counsel Ineffectiveness In Violation Of his Sixth Amendment to the United States Constitution.

---

The Sixth Amendment guarantees the right to effective assistance of counsel in any criminal prosecution. Darnell Davis, on Trial for first degree Rape, was denied that right.    In order to establish such a claim, one must Show that (A) counsel's performance fell below an objective Standard of reasonableness, And (B) counsel's deficient performance deprived the defendant a Fair Trial. Strickland V. Washington. 466. U.S. 668 (1984)

10

In order to establish prejudice, A defendant must Show that there is A reasonable probability that but for counsel's errors the outcome would have been different. <u>Strickland</u>, 466 U.S. At 694. "A reasonable probability is A probability sufficient to undermine confidence in the outcome" <u>Id.</u> Allegations of ineffective counsel must be viewed as A whole rather than piecemeal, See: <u>Frey v. Fulcome</u> 974 F. 2d 348, 361. N. 12 (3d Cir 1992) <u>cert. Denied.</u> 113 S. Ct. 1368 (1993) ("The prejudice question under <u>Strickland</u> is whether All of counsel's unprofess-unprofessional errors combined undermine confidence in the result") (Emphasis in original); <u>Foster v. Delo.</u> 11 F3d 1451, 1457 (8th Cir 1993).

The defendant acknowledge that Trial counsel's representation is presumed to be "professionally Reasonable" <u>Strickland</u>, 466 US At 699; <u>Outten v. State</u>, Suppra, 720 A2d. At 551 (Quoting <u>Flamer</u>, 585 A 2d At 753)

Darnell Davis received ineffective Assistance of counsel At his July 2004 Trial. In this           petition, Davis Asserted that (1) His Trial counsel, E. Stephen Callaway Esq. failed to object And correct, Trial court's incorrectly Interpretion of the 2econd degree Rape instruction to the jury of the lesser included.

(2) Trial counsel failed to make Any effort to produce mitigating information About Davis background; which include's that;

(A) He has mildly mentally retarded; Personality Disorder N.O.S with passive/Aggressive, And Anti-Social trails;

(B) He was placed in special education throughout School. He was one(1) of Five(5) children who grew up in A poor environment And that despite Exhibiting behavior problems As a Child, his family lacked the where

Wherewithal to get him the profession
Counseling that he Needed.

(3)   Trial counsel failed to preserve DAVIS ability
to file a meaningful appeal of his criminal
Conviction to the Delaware Supreme court.

## Trial Counsels Performance:

On the beginning of the third day of the Trial,
while the State was still presenting its case. The State
Requested to have an lesser included offenses
Charge to the jury.    The State wanted,
Second and fourth degree rape as lesser included
from First degree rape.    Further, Requested an
Lesser of unlawful Sexual contact Third degree
from First degree:
without any objection by trial counsel, This court
found that there was a rational basis in the
Evidence to acquit DAVIS, and to support conviction
of the lesser charge's. Therefore, The court permitted
Inclusion of the lesser offenses.

The defendant, DAVIS Trial counsel failed to object and argue the lesser included offense of "Second" degree Rape.

Above and beyond the introduction of the Second degree Rape. The Reading/Articulation of the elements-Reading in the jury instruction on the Second degree Rape was so egregious that it Contaminated the integrity and fairness of the Trial.

When Trial court was going over the jury instruction's to the jury (and in the reading of the Second degree Rape) Trial court Readed the First degree Rape Instruction in its "Entirely." See; (Jury instruction on First degree Rape)

However. In Articulating the Second degree Rape. element's Instruction to the jury, Trial court did not give the jury the full menu of the elements of Second degree Rape.

Since it is in the public Interest to present the jury with "All the Facts and All the possible reading's that may Reasonable be Found from Such Facts". SEE;

14

STATE V Purvell, N.J. 601 A2d 175, 181 (1992) (Quoting
State V Choice, N.J. 486 A2d 833, 35 (1985)
Also, State v Short, N.J. 618 A2d 316-323 (1993)

It can not be said to have been a sound trial strategy to agree on the lesser included count of Second degree Rape. From the record, Trial counsel's Strategy was to pitch this case as an "All or Nothing". However, the State Notice the first degree Rape evidence was it in their Favor, And requested the lesser counts. At a minimum, Trial counsel Should have Argue; (1). Assuming Arguendo that DAVIS Never Admitted having Oral Sex with Yalisha. The evidence cries out for a verdict of Fourth degree Rape.
The evidence which supports a Fourth degree Rape;
        "Intentionally Engages in Sexual intercourse with a victim not yet reaches his or her Eighteenth birthday",...
• is simply "overshadowed" by the evidence which supports an. Second degree Rape;
        "Intentional Engages in Sexual intercourse without the victim consent",....

Besides Actually handing the jury DAVIS conviction, It is difficult to Fathom A more devastating way to communicate to the jury About DAVIS taken Advantage of Yalisha's Age.

The jury very easily could have thought that the second degree Rape charge was the only count which carried enough punishment to address the Age of DAVIS (37) And Yalisha (17).

Because of that uncertainly, we'll never no how the jury viewed the Fourth degree Rape charge/count standing Alone.

There is A reasonable probability that had trial counsel Argued/or objected to the (Second degree Rape, count) And or Argue For the more relevant charge of the Fourth degree Rape.

Trial court, would have just instructed the jury only on the Fourth degree Rape count. Trial counsel's decision Not to object, greatly prejudice the defendant of a Fair trial.

16

## Sentencing:

Darnell Davis recieved ineffective assistance of counsel at his Oct. 2004 Sentencing. In this petition, Davis asserted that, (1) trial counsel failed to make any effort to produce mitigating information about Davis's background: which Icludes: (1) He was mildly mentally retarded, (2) Personality Disorder: (3) Nos with passive/aggressive and anti-social trails. (4) He was placed in special education class-throughout School.

After Davis was found guilty, A (P.S.I) was ordered. During Davis Sentence on Oct. 22.2004 Trial counsel Just Simply plea for mercy, without any investigation into mitigating evidence. That Does not Satisfied Strickland.

Because, Davis was facing a long prison Sentence, in light of the (New law) on the Second degree degree Rape Conviction, Counsel Should, at a minimum, done something more than read the (P.S.I) report and ask the court to impose the minimum mandatory Sentence.

Closer to home. This court ruled that trial counsel was ineffective in a Delaware Capital murder case, where trial counsel without investigating various mitigating circumstances, simply pled for "mercy".

State v. Wright, Del. Super. 653 A2d 788, 301-03 (1994)

In wright, This court distinguished other cases, in which counsel's pled for mercy, but only after thoroughly investigating and evaluating potential mitigating evidence.

In this case, no such investigation (E.g. Psychological evaluation, input from Family or Friends, Gathering school records was done.

At a minimum, This court should allow the defendant the opportunity to explore mitigating evidence not presented at sentencing and to expand the record.

18

<u>Argument:</u>

B.        The need to Establish The Prejudice
          Prong of Strickland v. Washington.

It is well recognized to note that
"The prejudic question under <u>Strickland</u>
is whether all of counsel's unprofessional
errors combined undermined our confidence
in the result" <u>Frey v. Fulcomer</u>, 974 F. 2d 348.
361. N. 12 (3d cir 1992) <u>Cert. Denied</u>, 113 S. Ct. 1368
(1993) <u>Foster V. Delo</u>, 11 F. 3d 1451. 1457 (8th cir
1993)

Consequently, This court should consider
Davis ineffective claim's as a whole,
Rather than in piecemeal fashion.

Finally, Davis urges this court to allow
him to expand the record, in order to
Fully and fairly present this petition
for consideration.

Wherefore, movant/Defendant Darnell Davis Request that this Honorable court grant his Writ of Habeas Corpus pursuant to 28 U.S.C 2254 By Vacating his conviction and sentence, And by granting him A New Trial And Or Sentencing hearing And Any other relief which this court deems just And Appropriate.

Date: 2-9-07

Darnell A. Davis

Darnell Davis

S. C. I.

Georgetown, Del.

19947

20

APPENDIX CONTENTS

CERTIFIED COURT DOCKET . . . . . . . . . . . . . . . . . . A-1

STATE'S EVIDENCE

    YALISHA JOYNES
        Examination . . . . . . . . . . . . . . . . A-52-53
    Cross Examination . . . . . . . . . . . . . . . A-54-55

    DEBRA HOLBROOK, SANE Nurse
        Examination . . . . . . . . . . . . . . . . A-69
    Cross Examination  . . . . . . . . . . . . . . A-73

    DET. JOHN E. MESSICK, JR.
        Examination . . . . . . . . . . . . . . . A-80,89
    Cross Examination . . . . . . . . . . . . . . . A-83

    TERI ZERBE, State Medical Examiners Office
    Direct Examination  . . . . . . . . . . . . . . A-91

DEFENSE'S EVIDENCE

    JOHN E. CLAYTON
    Direct Examination . . . . . . . . . . . . . . A-95
    Redirect Examination  . . . . . . . . . . . . . A-99

    ANTHONY REID
    Direct Examination . . . . . . . . . . . . . . A-100

    DAVON DAVIS
    Direct Examination . . . . . . . . . . . . . . A-102

SUPERIOR COURT CRIMINAL DOCKET                    Page    1
( as of  12/01/2004 )

State of Delaware v.  DARNELL A DAVIS                    DOB: 08/25/1965
State's Atty: ADAM D GELOF , Esq.          AKA: DURNELL DAVIS
Defense Atty: EDWARD S. CALLAWAY , Esq.          DURNELL DAVIS
                                                 RONALD A PORTER
                                                 DARNELL WATSON
                                                 KENNY N CHOES


Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 0307017279A | PS03080287I | RAPE 2ND WO CON | TGLI | 07/16/2004 |
| 002 | 0307017279A | S03080288I | PDWDCF | TNG | 07/16/2004 |
| 003 | 0307017279A | S03080289I | AGGR MENACING | TNG | 07/16/2004 |
| 004 | 0307017279A | PS03080290I | UNLAW SEX CON.3 | TGLI | 07/16/2004 |
| 005 | 0307017279A | S03080291I | PDWBPP | SEV | 07/09/2004 |
| 006 | 0307017279A | S03080292I | UNLAW IMPR 1ST | TNG | 07/16/2004 |
| 007 | 0307017279A | S03080293 | ENDANG. CHILD | NOLP | 07/12/2004 |

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 1 | 08/14/2003 | CASE ACCEPTED IN SUPERIOR COURT. ARREST DATE: 08/10/2003 PRELIMINARY HEARING DATE: BAIL: SECURED BAIL-HELD                48,000.00 | |
| 2 | 08/21/2003 | DISCOVERY RESPONSE FILED BY E. STEPHEN CALLAWAY, ESQ. | |
| 3 | 10/06/2003 | WAIVER OF INDICTMENT & INFORMATION FILED. | |
| 4 | 10/23/2003 | ARRAIGNMENT CALENDAR - DEFENDANT WAIVED READING; ENTERED PLEA OF NOT GUILTY; JURY TRIAL DEMANDED. CASE REVIEW DATE: 12-1-03 AT 9 A.M. | HOWARD ALICIA B. |
| 5 | 11/12/2003 | DEFENDANT'S LETTER FILED RE: PD REPRESENTATION | |
| 6 | 11/14/2003 | LETTER FROM JUDGE GRAVES TO DEF. RE: ADVISING COURT DOES NOT APPOINT CERTAIN PD'S TO REPRESENT AND DEF. MAY DISCHARGE PF'S OFFICE AND HIRE ANOTHER ATTORNEY | |
| 7 | 11/24/2003 | DISCOVERY RESPONSE FILED BY MARTIN COSGROVE, ESQ TO STEPHEN CALLAWAY, ESQ.  STATE'S RECIPROCAL REQUEST FOR DISCOVERY FILED. | |
| 8 | 12/01/2003 | CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW. | |

CERTIFIED
AS A TRUE COPY

ATTEST
PROTHONOTARY
CLERK

A-1

```
                        SUPERIOR COURT CRIMINAL DOCKET              Page    2
                          ( as of  12/01/2004 )

State of Delaware v.  DARNELL A DAVIS                    DOB: 08/25/1965
State's Atty: ADAM D GELOF , Esq.           AKA: DURNELL DAVIS
Defense Atty:                                    KENNY N CHOES

        Event
No.     Date          Event                        Judge
-----------------------------------------------------------------------------
        FCR: 4/7/04
        TJT: 4/12/04
9     01/22/2004                            GRAVES T. HENLEY
        DEFENDANT'S LETTER FILED.
        RE:  PROBLEM WITH DEFENSE.
10    01/27/2004                            GRAVES T. HENLEY
        LETTER FROM JUDGE GRAVES TO THE DEFENDANT.
        RE:  THE COURT DOES NOT DIRECT AN ATTORNEY ON HOW TO PREPARE A CASE.
11    03/17/2004
        SUBPOENA (10) SUSSEX COUNTY
12    03/19/2004
        CONTINUANCE REQUEST FILED BY THE STATE - DNA RESULTS NOT BACK FROM
        LAB.
15    03/31/2004
        CONTINUANCE REQUEST FILED BY THE STATE FOR CONTINUANCE OF 6/14/04 JT.
13    04/05/2004
        MOTION FOR SPEEDY TRIAL FILED BY THE DEFENDANT.
14    04/13/2004
        MEMORANDUM FILED FROM COURT TO STEPHEN CALLAWAY, ESQ RE:
        ENCLOSING PRO SE MOTION FILED BY DEFENDANT.
16    05/28/2004
        CONTINUANCE REQUEST FILED BY THE STATE.
17    06/02/2004
        LETTER FROM ADAM D. GELOF, DAG TO CAROLE DUNN, ESQUIRE
        RE: SUPPLEMENT TO DISCOVERY
18    06/09/2004
        LETTER FROM ADAM GELOF TO CAROLE DUNN RE:  PURSUANT TO THE STATE'S ON-
        GOING OBLIGATIONS, STATE WOULD LIKE TO ADVISE DEFENSE THAT THEY HAVE
        JUST RECEIVED ONE VHS TAPE, ONE 911 AUDIO TAPE, AND ONE AUDIO TAPE OF
        VICTIM'S STATEMENT.  IF SHE WOULD LIKE TO PROVIDE THE STATE WITH ONE
        BLANK VHS TAPE AND TWO AUDIO TAPES, HE WILL MAKE COPIES FOR HIS
        SUPPLEMENT TO DISCOVERY.
19    06/21/2004
        LETTER FROM ADAM GELOF TO CAROLE DUNN RE:  ENCLOSING A COPY OF TWO
        SEARCH WARRANT'S , THE SANE REPORT, AND THE DEFENDANT'S CRIMINAL
        HISTORY, AS A SUPPLEMENT TO DISCOVERY.
20    06/21/2004
        SUBPOENA (12) SUSSEX COUNTY
21    06/21/2004
        SUBPOENA (1) NEW CASTLE COUNTY SHERIFF
22    06/22/2004
        SUPPLEMENTAL RESPONSE TO DISCOVERY FILED BY ADAM GELOF, ESQ.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET                Page    3
                      ( as of  12/01/2004 )
```

State of Delaware v.  DARNELL A DAVIS                    DOB: 08/25/1965
State's Atty: ADAM D GELOF , Esq.           AKA: DURNELL DAVIS
Defense Atty:                               KENNY N CHOES

```
      Event
No.   Date          Event                          Judge
-----------------------------------------------------------------------
23    06/29/2004
      SUBPOENA(3) ISSUED.
24    07/01/2004
      SUPPLEMENT TO DISCOVERY RESPONSE FILED BY ADAM GELOF
25    07/08/2004                              BRADLEY E. SCOTT
      CASE REVIEW CALENDAR FINAL CASE REVIEW CONTINUED.
      PROSECUTION REQUEST - ATTORNEY ON VACATION.
      DEFENDANT TO BE BROUGHT IN TOMORROW FOR FINAL CASE REVIEW.
      CP-QUINN.
26    07/09/2004                              BRADLEY E. SCOTT
      FINAL CASE REVIEW:  NO PLEA/SET FOR TRIAL ON MONDAY, JULY 12,
      2004 AT 9:00A.M.
      MOTION TO SEVER CT #5 MADE BY THE DEFENSE, STATE DOES NOT OPPOSE.
      MOTION GRANTED.
      LETTER SENT TO CASE SCHEDULING AND AG NOTIFYING THEM OF THE CASE BEING
      SEVERED.
27    07/12/2004
      AMENDED INFORMATION
28    07/12/2004
      NOLLE PROSEQUI FILED BY ATTORNEY GENERAL.
29    07/12/2004
      VOIR DIRE
30    07/12/2004                              BRADLEY E. SCOTT
      JURY SELECTED.
31    07/12/2004                              BRADLEY E. SCOTT
      TRIAL CALENDAR- WENT TO TRIAL JURY
      CR-PURNELL.  CC-MONTAGUE.  CAPIAS ISSUED ON MATERIAL WITNESS,
      NAKEAMA T. DAVIS, DOB: 12/3/78, FOR 10,000.00 CASH ONLY CAPIAS.
32    07/13/2004                              BRADLEY E. SCOTT
      TRIAL CALENDAR- WENT TO TRIAL JURY
      CR-WASHINGTON CC-WILLIAMS
      CT BEGAN 10:22A.M.
      CT IN RECESS 2:57P.M.
33    07/14/2004                              BRADLEY E. SCOTT
      TRIAL CALENDAR- WENT TO TRIAL JURY
      CR-QUINN.  CC-MONTAGUE
      CAPIAS ISSUED ON ANTHONY REID DOB:  3/7/77 FOR FAILING TO REMAIN AS A
      WITNESS.  RECOMMENDED AMOUNT OF BAIL UPON RETURN IS $10,000.00 CASH
      ONLY.
34    07/15/2004                              BRADLEY E. SCOTT
      TRIAL CALENDAR- WENT TO TRIAL JURY
      9:14AM CT BEGAN
```

```
                   SUPERIOR COURT CRIMINAL DOCKET              Page    4
                     ( as of  12/01/2004 )

State of Delaware v.  DARNELL A DAVIS                  DOB: 08/25/1965
State's Atty: ADAM D GELOF , Esq.        AKA: DURNELL DAVIS
Defense Atty:                                 KENNY N CHOES

      Event
No.   Date         Event                         Judge
-------------------------------------------------------------------------
      MATERIAL WITNESS CAPIAS ISSUED ON ANTHONY REID AND NAKEAMA DAVIS
      WITHDRAWN
      5:34PM CT IN RECESS
36    07/15/2004
      CHARGE TO THE JURY FILED.
35    07/16/2004                              BRADLEY E. SCOTT
      JURY TRIAL - DEFENDANT FOUND GUILTY/PSI ORDERED.  SENTENCING SET FOR
      OCTOBER 22, 2004, AT 11:00 A.M.   STATE REQUESTED STATE EXHIBIT # 4 BE
      GIVEN BACK TO THE VICTIM AND A PICTURE SUBSTITUTED. JUDGE GRANTS  THE
      STATE REQUEST.  MR. GELOF SIGNED NOTE SHOWING HE RECEIVED STATE
      EXHIBIT # 4 AND GAVE THE COURT A PHOTOGRAPH.   BOND REVOKED.
37    07/16/2004
      COMMITMENT TO DEPARTMENT OF CORRECTION.
38    10/22/2004                              BRADLEY E. SCOTT
      SENTENCING CALENDAR: DEFENDANT SENTENCED.
      CR-QUINN.
39    11/03/2004
      COPY OF NOTICE OF APPEAL FILED IN SUPREME COURT BY DEFENDANT.
40    11/03/2004
      DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT FILED BY DEFENDANT.
41    11/05/2004
      AFFIDAVIT IN SUPPORT OF APPLICATION TO PROCEED IN FORMA PAUPERIS
      FILED BY DEF.
42    11/10/2004
      NOTICE OF APPEAL TO SUPREME COURT FILED BY STEPHEN CALLAWAY
43    11/10/2004
      LETTER FROM LISA SEMANS, SUPREME COURT, TO EILEEN KIMMEL
      RE: ADVISING THE TRANSCRIPT MUST BE FILED WITH PROTHONOTARY NO LATER
      THAN 12/15/04
44    11/10/2004
      DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT.
45    11/24/2004
      MEMORANDUM FILED.
      RE: ADVISING SUPREME COURT WILL DECIDE WHETHER OR NOT DEF. CAN
      PROCEED IN FORMA PAUPERIS SINCE APPEAL IS PENDING IN SUPREME COURT
46    12/01/2004
      LETTER FROM E. STEPHEN CALLAWAY TO COURT RE: REQUESTING A CERTIFIED
      COPY OF THE DEFENDANT'S COURT DOCKET AND A COPY OF HIS SENTENCE ORDER/
      SENT OUT ON 12/1/04.

            *** END OF DOCKET LISTING AS OF  12/01/2004 ***
                 PRINTED BY: CSCLMON
```

A-4

A-103

JOYNES - Cross

1   the Concord store so that person could use the

2   phone?

3       A    Uh-huh.

4       Q    Did you use that phone to call anybody to

5   come pick you up to take you home?

6       A    No, because at that point in time, I did

7   not feel like I was not going to get a ride home.

8   They hadn't had the argument then.  They had the

9   argument after we came back from the Concord store.

10      Q    You and Nakeama were getting along so well

11  because you had been going to the same college, and

12  you talked about teachers that you had and things

13  of that sort.

14      A    Yes.

15      Q    You struck up a friendship with Nakeama?

16      A    Yeah.

17      Q    So you stayed and just palled around with

18  her instead of calling somebody to give you a ride

19  home?

20      A    Actually, when we was at the Concord

21  store, I didn't, you know, feel as though I wasn't

22  going to get a ride home.  Like I said, the

23  argument occurred after we got back.

KATHY S. PURNELL
OFFICIAL COURT REPORTER
A-52

JOYNES - Cross

1   person's house, where I walked in the morning, to

2   Dove Estates, from where the situation occurred,

3   was shorter.

4        Q    It was closer to get to your friend's

5   house than walking back to Nakeama's house?

6        A    Yes.

7        Q    And when you walked from Nakeama's house

8   to this other person's house, was your friend's

9   house closer than that?  Do you understand what I'm

10  saying?  Would it be closer to walk from Nakeama's

11  house to the friend's house, or from Nakeama's

12  house to the person's house?

13       A    Had it been daylight out -- I'm just going

14  to explain it to you.

15       Q    Just answer my question.

16       A    I don't know no other way to answer your

17  question besides what I'm about to tell you.

18       Q    Was it closer or not?  If you don't know,

19  then say so.

20       A    I don't even understand your question.  I

21  don't understand.

22       Q    You left from Nakeama's house and walked

23  with the defendant, Mr. Davis, to some person's

JOYNES - Cross

1      Q    And in that 20 minutes, it was just the

2    two of you walking down the road?

3      A    Uh-huh.

4      Q    And he carried your backpack?

5      A    Uh-huh.

6      Q    Now, you indicated, I believe, that he had

7    a telephone on him?

8      A    Yeah.  Yeah, he had a cell phone.

9      Q    Did you call anybody on the cell phone?

10     A    He had no minutes.  It was a TRAC Fone.

11     Q    Did you put your telephone number on his

12   phone?

13     A    Yes, I did.

14     Q    Why did you do that?

15     A    Because when me and Nakeama exchanged --

16   me and Nakeama exchanged numbers and everything,

17   and she didn't write it down on a piece of paper.

18   But his cell phone was just as good as hers.  And

19   me and him were not exactly, you know, enemies or

20   anything like that.  Now, if he wanted to call,

21   well, like this is the person that gave you a ride

22   home or whatever, and start up small talk, I didn't

23   have a problem at that point.  So I didn't mind my

JOYNES – Cross

1    first room that you went into when you went into

2    the house?

3        A    I cannot remember whether or not I went

4    into another room before we went in the bedroom.

5        Q    Did you ask anybody there if they had a

6    telephone so that you could call to see if you

7    could find somebody to come get you?

8        A    Yes, I did.  I asked him if they had a

9    telephone.

10       Q    What was the answer?

11       A    No, they didn't have a telephone.

12       Q    Okay.  So then you went into another room

13   of the house, and it's your testimony that

14   Mr. Davis took off his shirt, his pants and got

15   into bed, pulled the sheets up over him?

16       A    Uh-huh.

17       Q    And you sat there on the edge of the bed?

18       A    Uh-huh.

19       Q    Did you fall asleep while you were in that

20   room?

21       A    No.  I seen the sun come up.  I didn't

22   fall asleep.

23       Q    So then did Mr. Davis put his hands on

A-120

JOYNES - Cross

1    you, touch you, say to you that he wanted to have

2    sex or do anything like that while you were in the

3    bedroom together?

4         A    No.  No.

5         Q    You were in the bedroom with him, dark,

6    didn't know where you were, and he didn't say

7    anything to you or do anything inappropriate?

8         A    No.

9         Q    You then got up you said at sunlight, went

10   into the living room, went on the couch and tried

11   to go to sleep?

12        A    Yes.

13        Q    Did you go to sleep?

14        A    Yeah, I nodded off.  I got a little nap,

15   whatever.  Not long enough because he was waking me

16   up.

17        Q    And who was waking you up?

18        A    The defendant was waking me up.

19        Q    What was he waking you up for?

20        A    I didn't understand that myself, because

21   my ride wasn't coming and everything.  He just

22   wanted me to wake up.

23        Q    Who was supposed to come?

C-117

REID - Direct

1     A     Uh-hum.

2     Q     And what happened when they got there?

3     A     When they got there, they all came in the

4     house.  Then Shabazz and the girl went back outside

5     and they was -- kissing and stuff.

6     Q     Could you see this?

7     A     Yeah.

8     Q     What were they doing?

9     A     They were just leaning against the car,

10    hugging each other, kissing.

11    Q     Leaning against whose car?

12    A     My car.

13    Q     Where was Nikki?

14    A     She was standing on the step.

15    Q     And you were standing -- where were you

16    standing?

17    A     On the step.

18    Q     And where was the gentleman that was

19    babysitting the children?

20    A     In the house.

21    Q     Okay.  When they got there to the house, had

22    Nikki been drinking?

23    A     When they got to the house?

REID - Direct

1    Q    When they pulled up to the house in the car,

2    the three of them, and Nikki got out, did you have a

3    conversation with her?

4    A    She wasn't drinking until she got in the

5    house.

6    Q    Wasn't drinking until she got in the house?

7    A    Yeah.

8    Q    How about Davis?

9    A    Well, he was the passenger.  He was

10   drinking.

11   Q    How about the girl?

12   A    I think -- I don't know if she drunk, but I

13   know we was smoking.

14   Q    Smoking what?

15   A    Marijuana.

16   Q    Where were you doing that?

17   A    In the outside.

18   Q    And was she partaking in that?

19   A    Yes.

20   Q    So you were all outside at one point in

21   time?

22   A    Yes.

23   Q    Then you and Nikki go onto the step and go

C-151

DEVON DAVIS - Direct

```
 1      A     2003?

 2      Q     Yes, sir.

 3      A     Yes, I did.

 4      Q     Okay.  Where did you see him?

 5      A     At my house.

 6      Q     Can you tell the ladies and gentlemen of the

 7  jury what took place on that morning?

 8      A     He came into my house.  Actually, he knocked

 9  on my door, said, "Cuz, can I spend the night?"  I

10  said, "Sure."  He walked in and lady walked in behind

11  him.  And they went to the living room.  I went back

12  to my room and went to bed.

13      Q     Did he ask you for anything else besides

14  spending the night?

15      A     No.

16      Q     Did you know the lady that was with him?

17      A     No, I don't.

18      Q     Have you ever seen her before?

19      A     No, I haven't.

20      Q     Did he tell you what her name was?

21      A     No, I haven't.

22      Q     Do you remember what she looked like?

23      A     No, I don't.
```

C-152

DEVON DAVIS - Direct

1    Q    Do you remember what she was wearing?

2    A    No, I don't.

3    Q    Okay.  Was anyone else in the house with you

4    that night?

5    A    Me and my girlfriend, yeah.

6    Q    You saw her come into your house?

7    A    Yeah.  I seen her come in, but it was -- it

8    was dark.  I didn't turn the lights on.  He said who

9    it was.  I just opened the door and let him in.

10   Q    Did you have electricity at the time?

11   A    No, I didn't.

12   Q    So you had no electricity or no lights in

13   the property?

14   A    No, I didn't.

15   Q    And when you left, they were in the living

16   room?

17   A    How?

18   Q    When you left and went back into your

19   bedroom, they were in the living room?

20   A    Yes.

21   Q    What kind of furniture, couch, in your

22   living room?

23   A    I had it was tan furniture with flowers on

DARNELL DAVIS - Direct

C-173

1    Q    The two of you were in Anthony Reid's car?

2    A    Yeah, Anthony's car.

3    Q    What kind of car was that?

4    A    White Concorde.

5    Q    And what happened when you got to

6    Hollybrook?

7    A    Well, in the front section, the 1900

8    building, I know a cat CR. They sell weed out there,

9    and that's where I went out, but I don't think CR was

10   home. Standing out front was Rock, some other chick,

11   and I think Ish was out there. And I got out of the

12   car. I went and talked to Rock. "Anybody seen CR?"

13   He said, "No." I said, "Anybody got some weed out

14   here?" He said, "No. CR is the one that got it."

15   And Ish she said she know where CR was at. She said

16   over in Carvel. She said, "I can take you. Show you

17   where he stays at if you give me a ride." I said,

18   "Yeah, all right." She had to run back in the house

19   and got her bag, and we went out to Carvel.

20   Q    Was she outside talking to Rock and

21   Ms. Hughes?

22   A    Yeah, and some other female.

23   Q    And you were in -- where were you?

DARNELL DAVIS - Direct

1    A    Well, when I got -- we pulled up, and I

2    jumped out the car, and they was all talking to Rock.

3    They was drinking.  They had beers out there.

4    Q    Who is "we"?

5    A    Me and Nikki.

6    Q    And you were present?  You were talking to

7    him?

8    A    Rock, yeah.

9    Q    Did you hear any conversation from Yalisha

10   about needing a ride to go home?

11   A    No, because it was a group of people out

12   there, and you know, like, Rock, another female, and

13   Ish she was out there.  And when I approached them,

14   they wasn't -- the only thing was talking, like,

15   nothing, like, that I asked where CR was at, you

16   know, wanted to get some weed.

17   Q    Did you and Yalisha get back into the car

18   with Nikki?

19   A    Ish said she know where CR at.  He staying

20   out at Carvel Garden.  Could I get a ride.  Could I

21   give her a ride.  She wanted to go out that way

22   toward Wexford.  I say, "Yeah, show me where CR is

23   at."  She went in and grab her bag, came back.  We

C-175

DARNELL DAVIS - Direct

```
1    went out to Carvel Gardens.

2        Q    She asked for a ride home?

3        A    Yeah.

4        Q    Or to where?

5        A    She asked to get a ride.

6        Q    Did she say where?

7        A    Wexford later on I found out.

8        Q    But at that time, did she say Wexford?

9        A    Unh-unh.

10       Q    She wanted a ride?

11       A    Yeah.

12       Q    Did she say where?

13       A    No.

14       Q    Okay.  So the three of you got in the car

15   and drove over to Carvel Gardens?

16       A    Drove to Carvel Gardens.  Cousin Nikki

17   stayed in the car.  Ish -- we went to the apartment

18   and knocked on the door.  She knocked on the door

19   because she know where we was going at.  He wasn't

20   there, but he came from around the side of the

21   building.  He came out.  Then I talked to him.  I got

22   a bag of weed from him, and then we came back to the

23   car, and when we first left -- when we first went
```

1     broke up.  I don't talk to her no more."

2          Q     Anything unusual happen on the route from

3     Carvel Gardens out to Concord, out to Nikki's house?

4          A     I was talking.  We was talking.

5          Q     Okay.  And what happened when you got out to

6     Concord, Nikki's house?

7          A     We got there.  I think we stopped and got

8     some beer on our way there, stopped got some beer,

9     rolled a couple of joints up, smoked them in the car.

10    We all smoked weed and was smoking, and then we got

11    there, got out, took the beers in, started talking to

12    Ish, talked to her for a little while, you know what

13    I mean, conversating, couple more beers out there on

14    the step.  Anthony came out.

15         Q     Who came out?

16         A     Anthony, my brother, then he came out

17    stopped there.  We all smoked some more marijuana.

18         Q     Anthony was talking about he observed you

19    and --

20               MR. GELOF:  Objection, Your Honor, again

21    leading.

22    BY MR. CALLAWAY:

23         Q     You were present when your brother

C-180

DARNELL DAVIS - Direct

1    my phone.  She used the phone.  She used my cell

2    phone.  We sat in the car, back seat of my brother's

3    car.  She used my cell phone.

4        Q    Now, you confused me.  You said you went

5    out, the two of you, and were walking?

6        A    Uh-hum.

7        Q    Now you have us back in the back seat of the

8    car?

9        A    Walking down the road, talking, drinking

10   beer, smoking weed.

11       Q    And you got back to Nikki's house?

12       A    Came back to Nikki's house, then we sat in

13   the car.

14       Q    Whose car?

15       A    My brother's, Anthony, car.

16       Q    Which car was that?

17       A    The white Concorde.

18       Q    And what happened in the white Concorde?

19       A    Ish she performed oral sex on me.

20       Q    Did you make her do it?

21       A    No.

22       Q    Did you have a stick in your hand?

23       A    No.

DARNELL DAVIS - Direct                C-182

1    the car?

2        A    We stayed in the car.  My cousin Nikki she

3    came out of the house.  I can remember this because

4    this is crazy.  First, before I led her on to do

5    this, before we got to that point, she said, "I ain't

6    going to do this.  If I do this, I ain't never going

7    to see you again."  She said, "Before we get on doing

8    this, I ain't going to do this.  What if" -- she

9    said, "What if" -- she said, "If I do this, I never

10   see you again, and you probably got a girlfriend."

11   All that stuff.  I said, "I didn't."  You lying

12   talking like that, and then after we closed the door,

13   before she do it, "What if somebody coming out."

14   "Ain't nobody come out because everybody is in the

15   house."

16            When we was in the car, I seen Nikki, but

17   Nikki came -- she didn't see us in the car.  She

18   walked past the car and went down the road.  When she

19   came back, Nikki looked in the car, "Oops, excuse

20   me," and went back in the house.

21       Q    When you got out of the car, where did you

22   go?

23       A    Sat on the steps.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER
A-109

C-185

DARNELL DAVIS - Direct

1    the Concord deli?

2        A    Yeah, we did.  We went to the store.

3        Q    When?

4        A    Before he said he wanted to leave.  Well, he

5    wanted to use my phone, right, but my batteries was

6    dead.  The bars on the phone they was all the way

7    down because she was playing on my phone.  And we

8    drove to the store.  We all jumped in the car and

9    drove to the store, the deli.

10       Q    So you went to the Concord Deli after she

11   performed oral sex on you in the back seat of your

12   brother's car?

13       A    Uh-hum.

14       Q    Did she get out to make a phone call when

15   you got to the Deli?

16       A    Unh-unh.

17       Q    Who made a phone call?

18       A    I think Anthony did because he wanted to

19   call his old lady and Nikki.

20       Q    Why did you go to the Concord Deli to use

21   the phone?

22       A    Because Nikki didn't have a phone.

23       Q    After you went to the Concord Deli and used

DARNELL DAVIS - Direct

1       Q      Who was Devon?

2       A      He was the one that was testifying on the

3    stand, my cousin.

4       Q      He lives down the road?

5       A      Yeah, about a mile.

6       Q      Did you leave?

7       A      Yes.  When I was leaving, I was so pissed

8    off, and I was leaving and Ish said -- I said, "Man,

9    I am gone.  I am out."  So I said, "Stay there.  She

10   might get a ride."  I was hot.  She said, "I am not

11   staying there."  She was running behind me.  Slow

12   down.  Slow down.  Fuck this shit, excuse my

13   language.  I said, "F this stuff.  I am hot", and she

14   sad, "Don't get mad at me."  She grabbed me around my

15   arm when I was walking and pulled me down, told me to

16   slow up, and we got to walking.  I said, "Man, I

17   don't know if he is home or not.  You should go back

18   there and make Nikki give you a ride home.  She will

19   get you a ride home.  They think I have drugs on me.

20   That is why they don't want to give me a ride.  You

21   should stay back."  She said, "I don't want to stay.

22   She is crazy.  I am going with you," and we walked

23   towards my cousin's house.

C-190

DARNELL DAVIS - Direct

1    on go in, right.  And I said, "Yo, man."  He said,

2    "You can come in and spend the night.  I take you in

3    the morning."

4        Q    When you went in, where did you go?

5        A    Went to the living room.

6        Q    What did you do in the living room?

7        A    No, back track.  When we went in, I said,

8    "Man, can I have some lights on in the house?  It's

9    so dark."  "No, man."  His brother got the light bill

10   cut off that was staying in the house prior.  Devon

11   used to stay at 4145 Gun Rod Club Road.  He wasn't

12   staying there but just recently moved back, and the

13   lights, the time he was staying back there, the

14   lights had got turned off.  His brother never paid

15   the light bill.  The lights were turned off.

16       Q    Where did you go?

17       A    Living room.

18       Q    Is that the same room you went into?

19       A    Yeah, the living room.  The big picture

20   window in the living room so he can let light from

21   the outside street lights to shine to the house.

22   That's where I went.

23       Q    What did you do in the living room?

C-191

DARNELL DAVIS - Direct

1     A     Went to sleep.

2     Q     Where?

3     A     On the couch.

4     Q     And where was Yalisha?

5     A     She went to sleep.  She dozed off on the

6     couch too.

7     Q     You were both on the same couch?

8     A     On the same couch.

9     Q     Do you know how long you slept?

10    A     I slept till daybreak.  I went to sleep.  I

11    was tired.  I was frustrated.  I was pissed off, and

12    when I woke up, I went back there and hollered at

13    Devon.  I say, "Yo, man, you going to take me home?

14    Devon, yo, get up."  Never answered the door.  And I

15    and Yalisha -- I said, "Yo, man, we might have to

16    walk, you know what I mean."  She said, "I ain't

17    walking."  She said, "I ain't walking."  So I was

18    just joking when I said we might have to walk because

19    I know Devon would get up and take us because he told

20    me he would take us anyway.  By that time, we were

21    sitting, and I said, "This been one crazy night."

22    She said, "I know, man."  She said, "Your cousin

23    Nikki and them they are a trip."  I said, "Yeah,

1    man."

2          And I was, you know, how you think but you

3    thinking out loud, and I said, "Damn, my girl is

4    going to be hot at me because I just stood out the

5    week prior before that, and she said if I stay out,

6    she was going to kick me out," and I was thinking out

7    loud.  Ish said, "You didn't mess with Weez."  I

8    said, "Oh, man.  Yeah, I mess with her off and on."

9    "So, you are a piece of shit.  You just sit there

10   told me you weren't messing with her last night.  You

11   see I did what I did, and you ain't shit."  She said,

12   "That is all right."  She going to go get a ride.

13   "Why the hell you walk here if you could have get a

14   ride?"

15          She stormed out the door, but when she went

16   out the door, she stood in the driveway and talked to

17   the driver.  I could see in the picture window -- you

18   could see in the driveway she then walked back.  I

19   thought she was coming back in, but she didn't come

20   back in.  When I looked out again, she was gone.

21        Q    Did you ever see her after that?

22        A    No.

23        Q    Did you ever go into that music building

DARNELL A. DAVIS
Direct Examination. . . . . . . . . . . . . . . . . A-104

        . . . . . . . . . . . . . . . . . . .

D. HOLBROOK - CROSS

```
 1          (Pause.)

 2   BY MR. CALLAWAY:

 3      Q.   Do you know when that blood was drawn?

 4      A.   I don't recall.

 5      Q.   Do you have any documents here that can tell

 6   you?

 7      A.   I don't know what you have here, sir.  I know

 8   I don't have it in my sexual assault for that day she

 9   was brought in.

10      Q.   Okay.

11      A.   That's the paperwork I brought with me.

12      Q.   If that blood had been drawn that day, would

13   you have tested it for drugs or alcohol?

14      A.   Absolutely not.

15      Q.   You did a fluoroscope, whatever you call it,

16   the light you shine on it and you did a Woods lamp.

17   What is that?

18      A.   That is an ultraviolet light.

19      Q.   What did you see when you looked through the

20   ultraviolet light?

21      A.   Certain materials fluoresce under ultraviolet

22   light.  If I see something that is dry that might be a

23   secretion, I see if it fluoresces and I pass that
```

DAVID WASHINGTON
Official Court Reporter

A-66

D. HOLBROOK - CROSS

1   along.  It did fluoresce.

2        Q.   You do not know what it is you fluoresced, so

3   you took it?

4        A.   Absolutely.

5        Q.   Did she tell you why she didn't want her

6   blood drawn?

7        A.   She didn't.  She may have, but I don't recall

8   what she said.

9        Q.   Okay.  You confused me when you started.  You

10  said that there was non-consensual sex act and you

11  said she didn't say that?

12       A.   They weren't her words.

13       Q.   Whose words were they?

14       A.   Excuse me?

15       Q.   Whose words were they?

16       A.   They weren't a direct quote when I was saying

17  them to him, that's why I wanted to make sure the

18  Court knew she didn't use the words:  Non-consensual.

19       Q.   Where did that term come from?

20       A.   From me.

21       Q.   That was based on what?

22       A.   Her medical history.

23       Q.   Which is what she told you?

D. HOLBROOK - CROSS

1    A.    That would be correct.

2    Q.    There is no evidence, none of these things

3    you have done can tell us whether or not this was

4    consensual sex or oral sex between the two of them?

5    A.    That is correct.

6    Q.    In this case you are showing us here today,

7    what shows us there was oral sex between the two of

8    them?

9    A.    My medical history.

10   Q.    Going back to what she told you?

11   A.    That's my medical history, sir.

12   Q.    Does she tell you she was choked during the

13   act of actually the oral intercourse?

14   A.    She didn't say choked, no.

15   Q.    Did you examine her neck?

16   A.    I did.

17   Q.    And what did you find?

18   A.    That was supple with no markings.  What that

19   means, there was soft, free motion of it without

20   markings noted anywhere.

21   Q.    On your first page of your report that has

22   the State of Delaware Medical Report of Suspected

23   Sexual Assault, Offender Control of the Patient?

D. HOLBROOK - CROSS

1    A.    Yes.

2    Q.    The third one down on the far left-hand

3    column, what does that say:    The offender control of

4    the patient, the third line down?

5    A.    Beaten and choked.

6    Q.    That is a question that is asked?

7    A.    That's a question that is asked.

8    Q.    What was that answer you got?

9    A.    No.

10   Q.    Did she indicated to you she had been pushed

11   in the back?

12   A.    She did not state that to me.

13   Q.    Did she indicate to you that she and the

14   offender struggled over getting her top on or off?

15   A.    I don't -- I don't go into that.  I don't go

16   that deep in the interview.  My medical history pretty

17   much doesn't allow a lot of details from the scene

18   unless they pertain to anything as far as injury they

19   find on the body.

20   Q.    But if the patient were to say:  He hit me

21   over the head with a two-by-four --

22   A.    I would certainly note that in my exam, yes,

23   sir.

D. HOLBROOK - CROSS

1      Q.    If the patient said:  He choked me during the
2  course of the oral intercourse, you would certainly
3  examine the neck to see if there was bruising and
4  marks on it?
5      A.    Yes.  Whether they show up or not is how far
6  out the exam was.
7      Q.    She said she wasn't choked and you saw no
8  evidence of that?
9      A.    When I asked her if she was choked, she
10  responded no.
11      Q.    You saw no evidence, anything on her neck?
12      A.    No.  It was pretty short out.  This is only a
13  few hours since it happened.  I wouldn't expect to
14  find a bruise.
15      Q.    Did she come back to you and say:  Look, a
16  bruise came up?
17      A.    Patients don't return to us, sir.  Very
18  rarely.
19      Q.    Did she indicate to you there was any
20  struggle between her and the assailant involving her
21  hands or arms?
22      A.    Not that I recorded.
23      Q.    Did you examine her arms and hands to see if

DAVID WASHINGTON
Official Court Reporter

A - 70

D. HOLBROOK - CROSS

1    there were any bruises, cuts, or abrasions on it?

2        A.    I did.

3        Q.    Did you find anything?

4        A.    I did not.

5        Q.    She told you that after the oral sex that she

6    spit multiple times outside of the shed?

7        A.    Yes.

8        Q.    As part of the physical force, offender

9    control of the patient, you have written down there:

10   Mushed my face.  Can you explain what that meant to

11   you or what she said?

12       A.    I don't remember how in depth mushed my face

13   was, but I put it in quotes.

14       Q.    All you saw or felt was some tenderness or

15   soft tenderness?

16       A.    I didn't see tenderness.  She expressed

17   tenderness.

18       Q.    Okay.  Expressed tenderness.  A technical

19   question.  Where did the dental floss come from to do

20   the flossing?

21       A.    From the emergency room department.

22       Q.    Is it part of the rape kit?

23       A.    It's not.  Much of what we use is not part of

D. HOLBROOK - CROSS

1    the rape kit.

2        Q.    It is just dental floss in a cabinet that was

3    used?

4        A.    There is dental floss in the cabinet.  It

5    wasn't maybe a foot or more of the initial floss that

6    was exposed.

7              MR. CALLAWAY:  Can I have the pictures?

8              May I approach the witness, Your Honor?

9              THE COURT:  Go ahead, Mr. Callaway.

10   BY MR. CALLAWAY:

11       Q.    I hand you what was marked as State's Exhibit

12   6, which is a photograph of Ms. Joynes' left breast, I

13   guess.

14       A.    Yes.

15       Q.    When you shined the light on that, what did

16   you see?

17       A.    I saw a florescent area.

18       Q.    Where?

19       A.    On her medial breast.

20       Q.    On her skin?

21       A.    On her skin.

22       Q.    Was there any stains or reflections on the

23   bra she has on in this picture?

DAVID WASHINGTON
Official Court Reporter

A-72

1      A.    The bra, the entire bra would have fluoresced

2   white.  By the nature of the fact of the ultraviolet

3   light, that wouldn't have meant as much as me seeing

4   something fluoresce on the skin.

5      Q.    Did you observe or see any stains or

6   material, fluorescent material on the bra itself?

7      A.    There was dried secretions on the bra, but

8   they fluoresce as soon as the bra does.

9      Q.    So there were dried secretions on the bra?

10     A.    On her bra and pants and her shirt, I

11  believe.

12     Q.    Can you see those dried secretions in this

13  picture?

14     A.    Vaguely on this picture.

15     Q.    They would be at the bottom portion of the

16  bra?

17     A.    I don't know where they would be on the bra,

18  sir.

19         MR. CALLAWAY:  One moment, Your Honor.

20         THE COURT:  Okay.

21         (Pause.)

22         MR. CALLAWAY:  I have no further questions of

23  this witness at this time, Your Honor.


                    DAVID WASHINGTON
                 Official Court Reporter

                      A - 73

J. MESSICK - CROSS

1    Mr. Holbrook at the hospital.

2        A.    When I had to get the evidence, yes.

3        Q.    That's where you got some of this information

4    from, you believe from that interview with

5    Ms. Holbrook as to what was in that report?

6        A.    Yeah.  That's where I perceived that, yes.

7        Q.    Did you read in that report or did

8    Ms. Holbrook tell you that Ms. Joynes said to her that

9    it was the first time for oral sex and she spit

10   multiple places outside of the shed; were you aware of

11   that?

12       A.    She showed me this.  She had written that on

13   her report.  That's what Ms. Holbrook showed me, yes.

14       Q.    On the 13th, on the day of the interview with

15   Ms. Holbrook, you were aware then Ms. Joynes had said

16   she had spit multiple places outside of the shed?

17       A.    Based on that, yes.

18       Q.    Did you perceive that to be meant that she

19   was forced to swallow when the oral sex was completed?

20       A.    Spitting of some sort, yes.  It made her get

21   sick.  I mean, just spitting.

22       Q.    Do you believe that may have been evidence in

23   this case?

DAVID WASHINGTON
Official Court Reporter

A-80

J. MESSICK - CROSS

1      A.   It's possible.

2      Q.   If you found her saliva and the defendant's

3  semen in a puddle on the outside of that building that

4  certainly would be something the jury would like to

5  hear?

6      A.   I interviewed her at 10:49.  I arrived at the

7  scene at 10:49.  By the time I cleared the hospital --

8  I can tell you the exact time I cleared the

9  hospital -- it was at least six to eight hours.  I

10  remember this was a hot day like today.

11      Q.   Semen will last forever in patient's

12  underwear and everything we are doing now?

13      A.   I anticipated it would be dried up.  I

14  assumed spit.  She said spit in the report.

15      Q.   You didn't go back and look?

16      A.   Not that day, no.

17      Q.   When you went back on the 17th, four days

18  later, you got your search warrant, you went back and

19  looked inside of the building?

20      A.   Yes, I did.

21      Q.   You found the Futon or bed?

22      A.   Sure.

23      Q.   It was a couch.  You found the bracelet?

J. MESSICK - CROSS

1    A.    Yes.

2    Q.    Did you do any other examination of that

3    scene at all?

4    A.    I searched around, yes.  What you perceive as

5    examination, what do you mean?

6    Q.    Did you call --

7    A.    We didn't luminal it and search for

8    everything.

9    Q.    Did you call Detective Swain and the crime

10   lab to go out there and examine it?

11   A.    No.  The scope of the search in applying for

12   the search warrant was a search for the bracelet and

13   stick.  That didn't call for an evidence technician

14   like that.

15   Q.    You knew there was an allegation of oral sex,

16   where the semen was on her chest, her clothes, that

17   she testified to, and she spit on the ground?

18   A.    My perception at that point was Ms. Holbrook

19   collected semen on the clothes or off her breast.

20   Q.    You didn't think it was necessary then to go

21   out and examine the Futon or couch or whatever it was

22   to see if there was any physical evidence there?

23   A.    I looked at it, but that wasn't the intent at

J. MESSICK - CROSS

1    that point, no.

2        Q.    You are not a criminalist, you are not a

3    forensic crime investigator, are you?

4        A.    No, I'm not.

5        Q.    You didn't call the division and have the

6    state police do that?

7        A.    No, because semen was collected by Ms.

8    Holbrook?

9        Q.    That's her?

10       A.    Correct.

11       Q.    You didn't look to see if there was semen in

12   this building?

13       A.    No.

14       Q.    You didn't go outside and look around to see

15   where she spit?

16       A.    I looked outside, looked for the stick.

17       Q.    Multiple places?

18       A.    No.  I didn't look for it, no.

19       Q.    Did you find anything in your examination

20   that you can put your finger on o establish that any

21   sex of any kind took place in that building?

22       A.    No.

23       Q.    But as Ms. Joynes said yesterday, there could

J. MESSICK - CROSS

```
 1   have been hair follicles in there, semen stains, could

 2   have been any kind of transfer of cells or material to

 3   tie that location with these people?

 4        A.   It's possible.

 5        Q.   But you never looked?

 6        A.   No, sir.

 7        Q.   Did you take pictures of that building on the

 8   inside of it?

 9        A.   No, I did not.

10        Q.   When you went back to the Loblolly Pine

11   address or Nikki's place, were there any cars there?

12        A.   There was a gold Lexis in the driveway.

13        Q.   Any other cars there?

14        A.   Not that I remember.

15        Q.   Did you take a picture of that residence?

16        A.   No, I did not.

17        Q.   No pictures of the property or ground where

18   the building was?

19        A.   No.

20        Q.   Did you examine that bracelet?

21        A.   I looked at it.  I don't know what you mean

22   by examine.  It's broken.

23        Q.   It's broken?
```

DAVID WASHINGTON
Official Court Reporter

A-84

J. MESSICK - CROSS

1        A.    Yes, it is.

2        Q.    Is there a jagged edge where the chain is

3    broken?

4        A.    Do you mind if I look?

5        Q.    Feel free.

6        A.    It's broken at the stone where there is a

7    metal piece that would have wrapped around it.

8        Q.    A tiny piece of that?

9        A.    Yes.

10        Q.    Did you take that bracelet to the Medical

11    Examiner's Office to determine if there was any

12    material on there?

13        A.    No.  It was placed in a bag and placed in the

14    evidence locker.

15        Q.    So no testing was done on that at all?

16        A.    No.

17        Q.    Did you look to see if there was any scars on

18    either of Ms. Joynes' arms where the bracelet came off

19    and broke?

20        A.    I believe I looked at her all over.  And

21    along the same line, asked if she was injured.

22        Q.    She said no?

23        A.    Right.

J. MESSICK - CROSS

1      Q.    You took a lot of stuff to the Medical

2    Examiner's Office?

3      A.    Yes.  I didn't, but there was a lot taken.

4      Q.    And to your knowledge, does the Medical

5    Examiner have the ability to test blood to see if

6    there are any substances in that blood?

7      A.    I don't know.

8      Q.    You do not know?  You don't know whether they

9    can do that?

10     A.    I don't know if it is standard procedure for

11   them to test.

12     Q.    I didn't ask you that.  Is it possible for

13   the Medical Examiner to test blood to determine

14   whether there is alcohol and drugs in it?

15     A.    I don't know.

16     Q.    You don't know that?

17     A.    For DUI cases, yes, or anything like that

18   they could test for alcohol and drugs.

19     Q.    The Medical Examiner has the ability to test

20   the blood to determine whether there are any drugs or

21   alcohol?

22     A.    Yeah.  I see what you are saying, yes.

23     Q.    We didn't get her blood until April of 2004?

DAVID WASHINGTON
Official Court Reporter

A - 86

J. MESSICK - CROSS

1      A.    That's correct.  I was unaware of that.

2           MR. CALLAWAY:  I don't have any more

3    questions of this officer.

4           MR. GELOF:  Nothing further.  But, again, I

5    am anticipating calling him tomorrow.

6           THE COURT:  Okay.  Thank you, Officer.  You

7    may step down.

8           MR. GELOF:  That's all I have for today, Your

9    Honor.

10          THE COURT:  Let's talk about tomorrow.  Come

11    on up.

12          (Whereupon, counsel approached the bench and

13       a discussion took place off the record.  After

14       which, counsel returned to the trial table and

15       the following proceedings were had:)

16          THE COURT:  All right, folks, we are done for

17    the day.  Again, please don't discuss the case amongst

18    yourselves or with anyone else tonight.  Do not follow

19    the case in the media, if it should be in there.  I

20    don't think it will be.  I need you to come back to

21    this courtroom tomorrow.  Come back tomorrow at 10:00

22    o'clock.  Again, we have things to do before you folks

23    get here and get started.  Hopefully we will be ready

C-63

ZERBE - Cross

1          MR. GELOF:  Nothing further, Your Honor.

2          THE COURT:  Mr. Callaway.

3                    CROSS-EXAMINATION

4     BY MR. CALLAWAY:

5          Q    Ms. Zerbe, the sperm fractions that were

6     found on the oral swabs and dental swabs, do you know

7     whose spermatozoa that was?

8          A    No, we were not able to obtain a DNA

9     profile.

10         Q    So you didn't get anything that you could

11    compare with the defendant or anybody else?

12         A    That's correct.

13         Q    So it could be the defendant's?  It could be

14    somebody else's?

15         A    That's correct.

16         Q    Okay.  And does your testing tell you when

17    that got there?

18         A    When the DNA was deposited?

19         Q    Yes.

20         A    No.

21         Q    And does your testing tell you whether or

22    not that sperm got there with the consent of

23    Ms. Joynes or without her consent?

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-91

C-64

ZERBE - Cross

1      A    No.

2      Q    All you know is you found what you found on

3  there?

4      A    Yes.

5      Q    And you were supplied, I believe, the pair

6  of sweat pants, sweat jacket, and bra?

7      A    Yes.

8      Q    And were you requested by the police to do

9  any analysis on those items?

10     A    Yes.  They requested that in the submitted

11  letter.

12     Q    Did you do it?

13     A    No.

14     Q    Why not?

15     A    It's generally our lab policy if we found

16  spermatoza in the sexual assault kit of the victim

17  that we stop there and proceed on with that sample.

18  If we find that it doesn't yield a profile, then we

19  go back and look at the clothes because it just kind

20  of narrows down our time for how many days we can

21  process.

22     Q    So even though it was asked for, you didn't

23  think it was important to do?

C-69

CLAYTON - Direct

1                    AFTERNOON SESSION

2          (Whereupon, trial in the above-entitled

3     matter reconvened at 1:40 o'clock p.m., at the

4     conclusion of the luncheon recess.)

5          THE COURT:  Are you ready, Mr. Callaway?

6          MR. CALLAWAY:  Yes, Your Honor.

7          THE COURT:  Mr. Gelof?

8          MR. GELOF:  Yes, Your Honor.

9          THE COURT:  Get the jury, please.

10         (Whereupon, the jury returned to the jury

11    box.)

12         THE COURT:  Mr. Callaway?

13         MR. CALLAWAY:  Your Honor, call John E.

14    Clayton, please.

15    Whereupon,

16                    JOHN E. CLAYTON

17    was called as a witness by and on behalf of the

18    Defendant and, having been first duly sworn, was

19    examined and testified as follows:

20                    DIRECT EXAMINATION

21    BY MR. CALLAWAY:

22    Q    Good afternoon, Mr. Clayton.

23    A    Good afternoon.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A - 95

C-70

CLAYTON - Direct

1     Q    I need to ask you a couple of questions.

2    I'm going to ask that you keep your voice up and

3    speak into the microphone.

4     A    Yes, sir.

5     Q    If you don't understand what I'm saying to

6    you, let me know.  I will rephrase it.  If you can't

7    hear me, let me know?

8     A    I will.

9     Q    I direct your attention to the gentleman

10    sitting over there at counsel table?

11    A    Yes, sir.

12    Q    Do you know that man?

13    A    Yes, sir.

14    Q    Who is that man?

15    A    Jermaze Darnell Davis.

16    Q    And how long have you known Darnell Davis?

17    A    About a year.

18    Q    About a year.  And how do you know him?

19    A    Through his cousin Nakeama Davis.

20    Q    Nakeama Davis?

21    A    Uh-huh.

22    Q    Is she also known as Nikki?

23    A    Nakeama Davis.  She go with my nephew

C-71

CLAYTON - Direct

1   Randolph Clayton.  He has three kids with her.

2       Q      Where do Nikki and the three kids live?

3       A      Out Coverdale.

4       Q      Is it close to Concord?

5       A      That's what I meant Concord by the pond,

6   bunch of brand new houses back there.

7       Q      And about this time last year, do you know

8   where Randolph was?

9       A      Incarcerated.

10      Q      Okay.  And as a result of Randolph being

11  incarcerated, did you have any association with

12  Nikki?

13      A      I was living in his house with her watching

14  his kids.

15      Q      And how long a period did you do that?

16      A      For about a year and a half.

17      Q      Okay.  Were you living with them in July of

18  last year?

19      A      Yes, I was there.

20      Q      Okay.  And did there come an occasion in the

21  early morning hours that Darnell and Nikki came to

22  the house?

23      A      Well, at the time, they had been out there

CLAYTON - Direct

C-72

```
 1   all that day, Nikki, Darnell, his brother, and
 2   another girl was riding in another car, his brother's
 3   car.  We had gave a party for my little nieces, and
 4   they believe down the street, and I had the other car
 5   with them down the street in it.
 6        Q    When you say they had been together, Nikki,
 7   Darnell, and who else?
 8        A    Darnell's brother.
 9        Q    What is his name?
10        A    I believe his name Anthony Davis.
11        Q    Who was there?
12        A    Another girl they had with them.
13        Q    Do you know her name?
14        A    I don't know her name.
15        Q    Can you describe her?
16        A    She short.  I think she is kind of dark
17   skinned.  I think she had short hair.
18        Q    Do you recall what she was wearing that day?
19        A    I recall what she was wearing that night
20   when I met her.  Some white pants with some kind of
21   name written on the back of the cheeks.  I don't know
22   what the name was, but I remember her coming in the
23   house.
```

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

C-73

CLAYTON - Direct

1    Q    When you say the cheeks, they were written

2    across?

3    A    The back of her buttock.

4    Q    Do you remember what color they were?

5    A    White.

6    Q    And the writing was what color?

7    A    Like dark brown, burgundy, because it was

8    nighttime.

9    Q    They had been together that day?

10   A    Most of that day when I seen them, yeah.

11   Q    When did you see them?

12   A    When I had the kids down to the party that

13   we gave them.

14   Q    Did you see them later that night?

15   A    Yeah, when they came back to my house.

16   Q    And do you recall what time they came back

17   to the house?

18   A    It was kind of late, right after midnight.

19   Q    What kind of vehicle was Nikki in?

20   A    They was in his brother's car, a burgundy --

21   I don't know the name of the car, but they came back

22   to get my nephew's car, the Lex, but I wouldn't let

23   them have it.


CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-99

CLAYTON - Direct

1    Q    Did Randolph have a car there?

2    A    Yes.

3    Q    What kind of car was that?

4    A    Lex, '92.

5    Q    Lexus?

6    A    Lexus, yeah, '92 SE.

7    Q    Do you know what color it was?

8    A    Tan.

9    Q    Okay.  And they weren't using that car?

10   A    No.  No, they weren't using that car.

11   Q    You said you wouldn't let them use that car?

12   A    They had used it, but when they came back, I

13   made them park it.  I wouldn't let them use it no

14   more.

15   Q    Why not?

16   A    Because it was getting late.  Everybody had

17   been drinking.  Cops might get something followed by

18   drinking.

19   Q    Who was drinking?

20   A    All of them was.

21   Q    Who is all of them?

22   A    Nikki, brother, him, that girl, and they was

23   smoking weed.

C-75

CLAYTON - Direct

1    Q    Do you recall what time they got back, if

2    you know?

3    A    It was -- I guess around little after 1:00.

4    Q    And what happened when they got there?

5    A    Darnell, Nikki, all them came in the house.

6    Nikki and Darnell went in my back bedroom, my room

7    where I slept at.  After Nikki and Darnell was back

8    there about five or six minutes, the girl that they

9    had with them she went back there.  When she went

10   back there, Nikki came out.  Her and Darnell were

11   still back there.  I was sitting at the table feeding

12   my little niece.  About eight or more minutes, then

13   Darnell came out and the girl came out.  So we sat

14   around for a while.

15           Darnell say, "Nikki, is you going to carry

16   me home because I told my brother go ahead."  So she

17   must have told him in the back she was going to carry

18   him home, but she didn't tell me.  So when he came

19   here, I said, "This car ain't being moved out of the

20   yard no more."  Then Darnell said, "Well, hell with

21   it or something, I am going to walk down here to get

22   my cousin to get him home."  That is your business

23   because this car ain't moving no more.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-102

C-76

CLAYTON - Direct

1    Q    Which car left?

2    A    His brother car.

3    Q    The car that they came up there in?

4    A    Uh-huh.

5    Q    At some point in time he left?

6    A    When Darnell left about two or three minutes

7    later, then the girl got up and left behind him.

8    Q    You are getting ahead of me.  They all came

9    up in Darnell's brother's car?

10   A    Yeah.

11   Q    Do you remember what kind of car that was?

12   A    Burgundy car.  I don't know the name of the

13   car.  But see in between that, they had used the Lex

14   and been riding around the Lex earlier, but that late

15   night they wanted to use the car to carry him back

16   home.

17   Q    Carry who back home?

18   A    Darnell, Nikki wanted to carry him home.  I

19   told him no.

20   Q    They came up in Darnell's brother's car?

21   A    They had been riding all that day in

22   Darnell's brother's car the whole time we had a

23   party.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-103

CLAYTON - Direct

1    Q    And was Darnell's brother there?

2    A    Yes, he was.  He was in the front with him.

3    Q    Did they all come in the house when they

4    first got there?  Did they all come in the house?

5    A    Yes.

6    Q    What did they do?

7    A    Everybody sat around drinking beer.  They

8    had been smoking weed outside.

9    Q    The young girl, the girl in the white pants,

10   did she consume any beer while she was there?

11   A    No.  She had been -- she had a beer when she

12   got there, but I told them later on when she getting

13   ready to leave, I told her I had nothing but one beer

14   left, and I wasn't giving that to nobody.

15   Q    His brother came with him in one car.  They

16   all went in the house.  At some point, his brother

17   left?

18   A    Yes.

19   Q    Took the car that he was in?

20   A    Took the car that he was driving.

21   Q    The only car left was the Lexus?

22   A    The Lex, uh-huh.

23   Q    At some point in time, Darnell asked who to

CLAYTON - Direct

1    take him somewhere?

2        A    He had to ask Nikki to carry him home when

3    he was in the back room.  Then when they come out the

4    back room, I was sitting at the table feeding my

5    little niece.  About 10, 15 minutes later, he said,

6    "Nikki, you going to carry me home," and Nikki said,

7    "You have to ask Bill."  I said, "You are not asking

8    this Bill.  You are not using this car no more."

9            After then, Darnell was siting there.  While

10   I guess about five or six minutes later, he said,

11   "Well, hell with it.  I can walk down here to my

12   cousin house, and he will carry me home."  Darnell

13   left out the house by himself.  About five, six

14   minutes later, then the girl came in there with him.

15   She got up and left after he had already left.

16       Q    Did she indicate to you that she was there

17   against her will?

18       A    No.  She didn't indicate none of that.  She

19   said she was happy when she come out from the

20   bedroom.  She went in the bedroom all willing.  She

21   came out later, asked for a beer, and sat around.

22   She ain't say nothing was wrong with her, nothing

23   like that to me in my presence.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A - 105

SBI # 00182712

DARNell DAVIS BLDG. Merit-west
SUSSEX CORRECTIONAL INSTITUTION
P.O. BOX 500
GEORGETOWN, DELAWARE 19947

State's
Mail

$04.05

To: Office of The Clerk
United States District Court
844 N. King Street, Lock box 18
Wilmington, Del
19801-3570

"Legal"
Mail

U.S.M.S
X-RAY

State's
Mail

State's
Mail